[Cite as *Costilla v. Weimerskirch*, 2021-Ohio-165.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

ANTHONY J. COSTILLA,

    PLAINTIFF-APPELLANT,          CASE NO. 5-20-12

    v.

HEATHER R. WEIMERSKIRCH,        O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20184224

Judgment Affirmed

Date of Decision:   January 25, 2021

APPEARANCES:

    *Kurt A. Dauterman* for Appellant

**PRESTON, J.**

{¶1} Plaintiff-appellant, Anthony J. Costilla ("Costilla"), appeals the January 31, 2020 judgment of the Hancock County Court of Commons Pleas, Juvenile Division, overruling his objections to the magistrate's decision. For the reasons that follow, we affirm.

{¶2} Costilla and defendant-appellee, Heather R. Weimerskirch ("Weimerskirch"), share one minor son, J.C. (Doc. No. 1). Costilla and Weimerskirch never married. At the time of J.C.'s birth, Weimerskirch lived in Tiffin, Ohio with her daughter, K.T. While Costilla is not K.T.'s father, K.T. regards Costilla as her father, and the two share a close relationship. After J.C. was born, Costilla and Weimerskirch "attempted to live together as a couple with [J.C.], but eventually separated * * *." (Appellant's Brief at 3). After their separation, Costilla and Weimerskirch successfully "maintained a joint or shared parenting relationship * * *." (*Id.*). However, Costilla and Weimerskirch's relationship became strained when Weimerskirch relocated to Toledo, Ohio in August 2018. At the time of Weimerskirch's relocation, K.T. was enrolled as a student in the Hopewell-Loudon Local School District. Costilla and Weimerskirch agreed that it would be better for K.T. to finish the school year at Hopewell-Loudon rather than to transfer into a Toledo-area school district. As a result, after Weimerskirch moved to Toledo, K.T., as well as J.C., remained with Costilla during "a great majority" of

the school week, and Costilla was primarily responsible for caring for both J.C. and K.T. (*Id.* at 4). Weimerskirch still exercised parenting time with J.C. and with K.T. when she was not working, but doing so entailed significant travel between Weimerskirch's Toledo-area residence and Hancock County, Seneca County, and Bowling Green, Ohio, where exchanges took place.

{¶3} On November 26, 2018, Costilla filed a complaint for custody, visitation, and support against Weimerskirch. (Doc. No. 1). In his complaint, Costilla requested that he be designated as the residential parent of J.C. and that he be awarded child support retroactive to May 1, 2017.[1] (*Id.*). On November 26, 2018, Costilla filed an amended complaint. (Doc. No. 3). Weimerskirch did not file an answer or any other pleading or motion.

{¶4} A final hearing was held on October 10, 2019. Weimerskirch appeared for the final hearing without counsel. On October 21, 2019, the magistrate issued his decision recommending that (1) the trial court find that it is in the best interest of J.C. for Weimerskirch to be named residential parent; (2) Costilla be granted unsupervised parenting time as J.C.'s nonresidential parent; (3) Costilla not be ordered to pay child support to Weimerskirch; and (4) Weimerskirch be entitled to claim J.C. as a tax dependent. (Doc. No. 17).

---

[1] As noted by the magistrate, because Costilla "has no blood ties to [K.T.]," there was "no basis for a [custody] motion through the court" for K.T. at that time. (Doc. No. 17).

{¶5} On November 1, 2019, Costilla filed his objections to the magistrate's decision. (Doc. No. 18). On December 23, 2019, Costilla supplemented his objections to the magistrate's decision. (Doc. No. 22). Weimerskirch did not file any reply to Costilla's objections. On January 31, 2020, the trial court overruled Costilla's objections and adopted the magistrate's recommendation. (Doc. Nos. 25, 26).

{¶6} On February 28, 2020, Costilla filed a notice of appeal. (Doc. No. 27). He raises one assignment of error for our review.

### Assignment of Error

**Decision was an abuse of discretion and against the manifest weight of the evidence for the father not to be named custodial residential parent given the parties' prior conduct to protect and serve the best interests of the minor child.**

{¶7} In his assignment of error, Costilla argues that the trial court abused its discretion by overruling his objections to the magistrate's decision.

{¶8} Generally, "[a]n appellate court reviews the trial court's decision to adopt, reject or modify the Magistrate's decision under an abuse of discretion standard." *Tewalt v. Peacock*, 3d Dist. Shelby No. 17-10-18, 2011-Ohio-1726, ¶ 31, citing *Figel v. Figel*, 3d Dist. Mercer No. 10-08-14, 2009-Ohio-1659, ¶ 9, citing *Marchel v. Marchel*, 160 Ohio App.3d 240, 2005-Ohio-1499, ¶ 7 (8th Dist.). Moreover, "'[d]ecisions concerning child custody matters rest within the sound discretion of the trial court.'" *Krill v. Krill*, 3d Dist. Defiance No. 4-13-15, 2014-

-4-

Ohio-2577, ¶ 26, quoting *Walker v. Walker*, 3d Dist. Marion No. 9-12-15, 2013-Ohio-1496, ¶ 46, citing *Wallace v. Willoughby*, 3d Dist. Shelby No. 17-10-15, 2011-Ohio-3008, ¶ 22 and *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "'"Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court."'" *Id.*, quoting *Walker* at ¶ 46, quoting *Barto v. Barto*, 3d Dist. Hancock No. 5-08-14, 2008-Ohio-5538, ¶ 25 and *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. "'Accordingly, an abuse of discretion must be found in order to reverse the trial court's award of child custody.'" *Id.*, quoting *Walker* at ¶ 46, citing *Barto* at ¶ 25 and *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). "'An abuse of discretion suggests the trial court's decision is unreasonable or unconscionable.'" *Id.*, quoting *Brammer v. Meachem*, 3d Dist. Marion No. 9-10-43, 2011-Ohio-519, ¶ 14, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶9} "When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding * * *, the court shall take into account that which would be in the best interest of the children." R.C. 3109.04(B)(1). "'[T]he best interest standard must be applied in initial actions to allocate parental rights in cases involving children of unmarried parents as well as in the context of divorce, dissolution, or annulment.'" *Loewen v. Newsome*, 9th

-5-

Dist. Summit No. 28107, 2018-Ohio-73, ¶ 16, quoting *Anthony v. Wolfram*, 9th Dist. Lorain No. 98CA007129, 1999 WL 771601, *2 (Sept. 29, 1999). R.C. 3109.04(F)(1) provides:

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the

household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1)(a)-(j).

{¶10} "The trial court 'has discretion in determining which factors are relevant,' and 'each factor may not necessarily carry the same weight or have the same relevance, depending upon the facts before the trial court.'" *Krill* at ¶ 29, quoting *Brammer v. Brammer*, 3d Dist. Marion No. 9-12-57, 2013-Ohio-2843, ¶ 41, citing *Hammond v. Harm*, 9th Dist. Summit No. 23993, 2008-Ohio-2310, ¶ 51. "Although the trial court must consider all relevant factors, there is no requirement

that the trial court set out an analysis for each of the factors in its judgment entry, so long as the judgment entry is supported by some competent, credible evidence." *Id.*, citing *Meachem* at ¶ 30, citing *Portentoso v. Portentoso*, 3d Dist. Seneca No. 13-07-03, 2007-Ohio-5770, ¶ 22.

{¶11} In its January 31, 2020 judgment overruling Costilla's objections to the magistrate's decision, the trial court found "upon its independent review * * * that the Magistrate analyzed the best interest factors and appropriately applied the law in all respects." (Emphasis deleted.) (Doc. No. 25). The trial court did not elaborate further. Therefore, in determining whether the trial court abused its discretion by overruling Costilla's objections, we will, by necessity, focus exclusively on the magistrate's R.C. 3109.04(F)(1) best-interest findings and the manner in which the magistrate applied and balanced these factors.

{¶12} First, with regard to R.C. 3109.04(F)(1)(a)—the wishes of the child's parents regarding the child's care—the magistrate noted that while Costilla "wishes to be named residential parent," Weimerskirch's "current wish is to have equal time with [Costilla]." (Doc. No. 17). The magistrate concluded that "[t]he evidence and testimony as to this factor points to placement with either parent as being in [J.C.'s] best interest." (*Id.*).

{¶13} As to R.C. 3109.04(F)(1)(b)—the wishes and concerns of the child regarding the allocation of parental rights as expressed to the trial court in an in-

chambers interview pursuant to R.C. 3109.04(B)—the magistrate noted that he did not interview J.C. (Doc. No. 17). "Absent a request by either party for the trial court to interview the children in chambers, the trial court [is] allowed, but not required, to do so." *Krill*, 2014-Ohio-2577, at ¶ 35, citing R.C. 3109.04(B)(1) and *In re Marriage of Munnings*, 11th Dist. Geauga No. 2005-G-2622, 2006-Ohio-3230, ¶ 18. Given that J.C. was just over three years old at the time of the hearing, the magistrate's decision not to interview J.C. was appropriate. *See id.* at ¶ 36.

{¶14} With regard to R.C. 3109.04(F)(1)(c)—the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest—the magistrate noted that J.C. "enjoys the time with each of his parents" and that "[e]ven with [Weimerskirch's] relocation, [Weimerskirch] has thought first of [J.C.] and allowed him to remain with [Costilla]." (Doc. No. 17). The magistrate also noted that Costilla and Weimerskirch do not have known criminal histories or histories of agency involvement, that both parents have maintained regular employment for a number of years, and that there was no indication that Costilla's or Weimerskirch's homes were inappropriate or unsafe for J.C. (*Id.*). Furthermore, the magistrate observed that J.C. appears to have an appropriate relationship with Costilla's fiancé and with Costilla's parents, who "have been in [J.C.'s] life consistently." (*Id.*).

{¶15} The magistrate placed particular emphasis on J.C.'s relationship with K.T. To the magistrate, the agreement to allow Costilla to care for both J.C. and K.T. while K.T. attended school at Hopewell-Loudon "sp[oke] volumes" as "there was absolutely no consideration that [J.C. and K.T.] should be separated." (*Id.*). In addition, the magistrate observed that J.C. "has stability with [K.T.] with who[m] he has resided * * * his entire life" and that "[t]here was mention that where one child went[,] so did the other." (*Id.*). The magistrate stated that "[o]n an otherwise equal slate[,] the presence of a sibling is of extreme importance in determining [J.C.'s] best interest." (*Id.*). Therefore, the magistrate concluded that "[t]he evidence and testimony as to [R.C. 3109.04(F)(1)(c)] point to the placement with [Weimerskirch] as residential parent as being in [J.C.'s] best interests." (*Id.*).

{¶16} Regarding R.C. 3109.04(F)(1)(d)—the child's adjustment to the child's home, school, and community—the magistrate found that while J.C. is not yet old enough to attend school, he does attend the YMCA. (*Id.*). The magistrate noted that J.C. "has had recent instability at the YMCA, where it was revealed that [J.C.] ha[d] screaming bouts and knock[ed] down the toys of other children." (*Id.*). The magistrate stated that Costilla's witnesses testified that J.C.'s behavior had "gotten worse recently," and he noted that Costilla's witnesses "blamed [J.C.'s behavior] on the child being transported back and forth between his parents." (*Id.*). However, the magistrate was skeptical of this explanation. (*Id.*). The magistrate

noted that "[t]he concerns kept coming back to [Weimerskirch's] move which was described as time and distance" and that "the parties are unable to solve a travel issue from Tiffin to Toledo." (*Id.*). The magistrate suggested that Costilla and Weimerskirch shared the blame for this state of affairs, and he stated that "[i]t is clear that both parties will have to give and take in order to solve this issue that will require stability." (*Id.*).

{¶17} In addition, the magistrate noted that J.C. had adjusted to Costilla's home "very well" and that "[t]here was also no negative testimony as to [J.C.'s] adjustment to [Weimerskirch's] residence in Toledo." (Doc. No. 17). The magistrate reiterated that he did not have any safety concerns about the home of either parent and that he did not have any concerns about the other occupants of either home. (*Id.*). Finally, the magistrate found that "[t]he age of [J.C.] does not lend too much of a community presence." (*Id.*). Thus, the magistrate concluded that "[t]he evidence and testimony as to [R.C. 3109.04(F)(1)(d)] point to the placement with either parent as residential parent as being in [J.C.'s] best interest." (*Id.*).

{¶18} With respect to R.C. 3109.04(F)(1)(e)—the mental and physical health of all persons involved in the situation—the magistrate found that "[t]here was no evidence presented that [Costilla] or [Weimerskirch] * * * suffer from mental health issues" and that "[t]he parties also seem to be in good physical health." (*Id.*).

Accordingly, the magistrate concluded that "[t]he evidence and testimony as to [R.C. 3109.04(F)(1)(e)] point to the placement with either parent as being in [J.C.'s] best interests." (*Id.*).

{¶19} Next, as to R.C. 3109.04(F)(1)(f)—the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights—the magistrate found that "it is likely that the parties will have significant difficulty dealing and trusting each other from this point forward." (*Id.*). However, he noted that "neither parent has refused parenting time for the other, as no Court Order has mandated a schedule of parenting time" and that the record did not contain "any filing mandating specific parenting times between the parties." (*Id.*). The magistrate thus concluded that his analysis of R.C. 3109.04(F)(1)(f) "point[s] to placement with either parent as being in [J.C.'s] best interests." (*Id.*).

{¶20} Concerning R.C. 3109.04(F)(1)(g)—whether either of the parents has failed to make child support payments as required by a child support order—the magistrate found that "[n]either party is currently subject to an order to pay child support to the other" but that Costilla "gave money to [Weimerskirch] prior to her move to Toledo, when the children resided in her home." (Doc. No. 17). The magistrate concluded that this factor "point[s] to placement with either parent as being in [J.C.'s] best interests." (*Id.*).

{¶21} With regards to R.C. 3109.04(F)(1)(h)—whether either parent has been convicted of or pleaded guilty to domestic violence or another criminal offense involving any act that resulted in the child being an abused or neglected child and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or neglected child—the magistrate found that "[t]here are absolutely no allegations of child abuse by [Costilla] or [Weimerskirch]" and that "[i]n fact, both of these parents lack any nefarious conduct in their past," including "criminal conduct or agency involvement." (*Id.*). Accordingly, the magistrate concluded that "[t]he evidence and testimony as to [R.C. 3109.04(F)(1)(h)] point to the placement with either parent as being in [J.C.'s] best interests." (*Id.*).

{¶22} Finally, the magistrate considered R.C. 3109.04(F)(1)(i)—whether one of the parents has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court—and R.C. 3109.04(F)(1)(j)—whether either parent has established a residence, or is planning to establish a residence, outside of Ohio. With respect to these factors, the magistrate found that "[t]here has been no parenting decree in this case" and that "[t]here is no evidence that either parent intends to relocate outside the state." (*Id.*). Therefore, the magistrate concluded that neither factor applied. (*Id.*).

**{¶23}** After examining the best-interest factors, the magistrate then summarized his decision to designate Weimerskirch as J.C.'s residential parent as follows:

The evidence is clear that both [Costilla] and [Weimerskirch] have provided a lot of love to [J.C.]. As their relationship flourished[,] the child was part of a stable and happy family. When the relationship fell apart, the parents lost their ability to work together to parent their child. Instead of pointing fingers[,] the Magistrate must set forth what is in the best interest of [J.C.]. In making this determination[,] the court would like to emphasize that neither parent is a danger to the child. Both parents love [J.C.] and can satisfactorily raise [him]. With all elements being equal, the key factor in favor of [Weimerskirch] is [K.T.]. Even with the termination of [her relationship with Costilla], [Weimerskirch] was able to put [J.C.'s] interest ahead of her own. The child was placed with [Costilla] for the balance of the school year[,] with the opinion that [Costilla] is a great father. Now that [Weimerskirch] is settled[,] there is no reason[] she should not raise her child[] in a home that contains his sibling with whom he has lived his entire life.

(Doc. No. 17).

{¶24} Thus, in deciding that Weimerskirch should be designated as J.C.'s residential parent, the magistrate carefully considered all of the relevant R.C. 3109.04(F)(1) factors. Costilla does not argue otherwise. Rather, Costilla takes issue with how the magistrate characterized some of the facts of this case during his analysis of the best-interest factors.

{¶25} Costilla first claims that the magistrate mischaracterized Weimerskirch's move to Toledo and her reasons for relocating. He notes that while the magistrate "state[d] [that] [Weimerskirch] was forced to relocate to Toledo," that was not the case. (Appellant's Brief at 7). According to Costilla, Weimerskirch instead "unilaterally elected to relocate to Toledo, Ohio * * * for work and [to] pursue other male suitors/relationships." (*Id.* at 3). He also questions whether Weimerskirch's pursuit of greater employment opportunities in Toledo was legitimate given that Weimerskirch works as a restaurant server and "[t]here is no specialized training needed to be a server * * *." (*See id.* at 7).

{¶26} While it is true that the magistrate stated that Weimerskirch "was forced to relocate based on [an] increase in rent," we think that Costilla makes too much of this statement. (Doc. No. 17). Reading this statement in context, we do not believe that it was the magistrate's conclusion that Weimerskirch had no choice but to move to Toledo after her apartment building was sold and the new owner increased the rent. Instead, the magistrate merely recognized that her relocation to

a new residence was effectively forced by the increase in rent, not that the increase required a move to Toledo specifically. Furthermore, from the record before us, Costilla's arguments about Weimerskirch's motivations for moving to Toledo and the validity of her reasons for moving are, at best, empty speculation. There is nothing in the record indicating that Weimerskirch did not sincerely believe that relocating to Toledo would better her employment opportunities. In fact, Weimerskirch testified that she "was working extremely part-time" while living in Tiffin and that since moving to Toledo, she has been able to work more favorable hours and make more money than she made in Tiffin. (Oct. 10, 2019 Tr. at 21, 23). Moreover, although Weimerskirch acknowledged that she had gone on dates with men in Toledo after she moved, there is nothing in the record to support a finding that she moved to Toledo for the purpose of improving her dating prospects. (*See id.* at 44-45).

{¶27} Costilla also maintains that the magistrate misconstrued Weimerskirch's decision to allow K.T. to remain with him during the week so that K.T. could continue attending school at Hopewell-Loudon. He argues that Weimerskirch allowed K.T. to stay with him so that Weimerskirch could "have free daycare with [him] and his family members * * * Monday through Friday for the majority of 2018 and 2019." (Appellant's Brief at 5). In addition, Costilla faults the magistrate for "believ[ing] [that] [Weimerskirch's] willingness to let someone

-17-

else keep both kids for over 15 month[s] * * * was done for the purpose[ ] of keeping the children together while she worked when in practice it permitted her to be free to let someone else raise her children Monday through Friday, and several weekends so she could live without the burdens of young children." (*Id.* at 6). However, while this might be Costilla's personal interpretation of Weimerskirch's decision to allow K.T. and J.C. to stay with him, the record simply does not support a finding that Weimerskirch desired to avoid her parental responsibilities and that such a desire lay behind her decision to let K.T. and J.C. stay together in Costilla's care.

{¶28} Furthermore, Costilla contends that the magistrate's findings concerning J.C.'s behavioral issues are not supported by the record. He states that the magistrate "viewed [him] and his witnesses of being narrow in their view and stated the child may have other reasons for behavior due to positive and negative reinforcement by [him] or his family * * *." (Appellant's Brief at 8). He argues that there is no evidence to support the magistrate's position and that "[s]uch analysis is purely speculative at best and inappropriate given the lack of evidence to such conjecture." (*Id.*).

{¶29} In the portion of the magistrate's decision addressing J.C.'s behavioral issues, the magistrate wrote:

[J.C.] has had recent instability at the YMCA, where it was revealed that the child has screaming bouts and knocks down the toys of other

-18-

children. The witnesses explain that this behavior has gotten worse recently and is blamed on the child being transported back and forth between his parents. Car time can be either a positive endeavor or a negative one depending on the presentation by the parents. The parent can be excited about the time with his child and the child with [sic] accept the happiness with cheer of his own. Likewise, if the parents are angry and not active in the child's transport, the child will respond negatively. Singing, reading, talking about the child's day are all great activities that parents can do inside or outside of a motor vehicle. This narrow view of the child's behavioral changes has limited the veracity of the witnesses presented by [Costilla]. Perhaps the parents and loving family members should look into the parents['] break up and caustic relationship when assessing causes of [J.C.'s] behavior.

(Doc. No. 17).

{¶30} Admittedly, the magistrate may have said more than he needed to say. The issue before the magistrate was whether J.C.'s behavioral problems were the result of him being driven back and forth between Toledo and Hancock/Seneca Counties. Neither Costilla nor Weimerskirch argued for or presented evidence to prove an alternative cause for J.C.'s behavior, and accordingly, it might have been best for the magistrate to refrain from opining on other explanations for J.C.'s

behavior. Nonetheless, the magistrate did not make a definitive finding that J.C.'s behavioral problems were caused by Costilla and Weimerskirch's break-up and the tenor of their relationship. Instead, the magistrate merely evaluated Costilla's witnesses and their explanations for J.C.'s behavior and concluded that their explanations were not persuasive; he essentially made a credibility determination. Based on our review of the record, we find no error in the magistrate's determination or in the trial court's decision to defer to his determination. *See Chicago Cycles, Inc. v. GE Capital*, 7th Dist. Mahoning No. 12 MA 29, 2013-Ohio-425, ¶ 41 ("The magistrate was in the best position to make this credibility determination as it was the magistrate who was able to observe the witnesses' demeanor, gestures, and voice inflections, and use these observations in weighing their credibility."); *Mackenbach v. Mackenbach*, 3d Dist. Hardin No. 6-11-03, 2012-Ohio-311, ¶ 9 ("[T]he trial court may rely upon the magistrate's credibility determinations when it reviews the magistrate's decision.").

{¶31} Other than challenging some of the magistrate's findings, Costilla appears to argue that the magistrate erred by giving determinative weight to J.C.'s relationship with K.T. and by diminishing the importance of other relevant factors. Costilla suggests that more weight should have been given to the fact that he "provided nutrition, care, nurturing, supervision, discipline, and education to both children while in his care a great majority of the time during the week." (Appellant's

Brief at 3-4). In a similar vein, Costilla argues that he was "given no consideration for being a mature and responsible father who is providing nutrition, care, hygiene, health, safety, guidance, and education for [J.C.] and * * * [K.T.] who calls him 'father' voluntarily." (*Id.* at 6-7).

{¶32} We commend Costilla for assuming the role of K.T.'s father figure and for his commitment to both J.C. and K.T. Costilla has demonstrated beyond question that he is a responsible, loving parent capable of prioritizing the health and wellbeing of his children. Nevertheless, Costilla's history of caring for J.C. and K.T. does not necessitate a conclusion that it is in J.C.'s best interest that Costilla be designated as J.C.'s residential parent. In determining J.C.'s best interest, the magistrate and the trial court were required to balance all factors relevant to J.C.'s best interest, including Costilla's and Weimerskirch's parenting capabilities. In much the same way that the evidence established Costilla's capacity to care for J.C. properly, the record also confirms Weimerskirch's parental fitness. Costilla's witnesses testified that Weimerskirch loves J.C., that she "instills good manners with him," and that they are not concerned about her ability to parent J.C. (Oct. 10, 2019 Tr. at 62-63, 78). Accordingly, we cannot say that Costilla's history of caring for J.C. clearly tips the balance in his favor. Moreover, with respect to Costilla's claim that the magistrate and trial court gave too much weight to J.C.'s relationship with K.T., we reiterate that it is within the discretion of the magistrate or trial court

to give greater weight to any one of the best-interest factors depending on the facts of the case. *See Krill*, 2014-Ohio-2577, at ¶ 29. In this case, where most of the relevant factors did not tilt strongly in favor of either party, we cannot say that it was unreasonable for the magistrate and the trial court to give decisive weight to J.C.'s relationship with K.T.

{¶33} Ultimately, to reverse the trial court's decision to overrule Costilla's objections and adopt the magistrate's recommendation that Weimerskirch be designated as J.C.'s residential parent, we must conclude that the trial court abused its discretion. That is, we must conclude that the trial court's decision was unreasonable, arbitrary, or unconscionable. Furthermore, in conducting abuse-of-discretion review, we must be mindful not to substitute our judgment for the judgment of the trial court. *Schroer v. Schroer*, 3d Dist. Hancock No. 5-19-21, 2020-Ohio-62, ¶ 13 ("When applying the abuse of discretion standard, a reviewing court may not simply substitute its own judgment for that of the trial court."), citing *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Even in circumstances where we might have reached a different outcome than the one reached by the trial court, we must affirm the trial court's decision if it is not unreasonable, arbitrary, or unconscionable. Here, the trial court's decision to overrule Costilla's objections and designate Weimerskirch as J.C.'s residential parent is not unreasonable,

arbitrary, or unconscionable. Accordingly, we conclude that the trial court did not abuse its discretion.

**{¶34}** Costilla's assignment of error is overruled.

**{¶35}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**